

NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the order of the Court.**

**Signed December 16, 2005**

**United States Bankruptcy Judge**

---

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| **VARTEC TELECOM, INC.,** *et al.*, | § | **Case No. 04-81694-HDH-11** |
| | § | |
| Debtors. | § | **(Jointly Administered)** |
| | § | |
| **OFFICIAL COMMITTEE OF** | § | |
| **UNSECURED CREDITORS OF VARTEC** | § | |
| **TELECOM , INC.,** | § | |
| **EXCEL COMMUNICATIONS** | § | |
| **MARKETING, INC., EXCEL** | § | |
| **MANAGEMENT SERVICES, INC.,** | § | **Adversary No. 05-3514** |
| **EXCEL PRODUCTS INC., EXCEL** | § | |
| **TELECOMMUNICATIONS, INC.,** | § | |
| **EXCEL TELECOMMUNICATIONS OF** | § | |
| **VIRGINIA, INC. EXCEL** | § | |
| **TELESERVICES, INC., EXCELCOM,** | § | |
| **INC., TELCO COMMUNICATIONS** | § | |
| **GROUP, INC., TELCO NETWORK** | § | |
| **SERVICES, INC., VARTEC BUSINESS** | § | |
| **TRUST, VARTEC PROPERTIES, INC.,** | § | |
| **VARTEC RESOURCES SERVICES,** | § | |
| **INC., VARTEC SOLUTIONS, INC.,** | § | |
| **VARTEC TELECOM HOLDING** | § | |
| **COMPANY, VARTEC TELECOM** | § | |
| **INTERNATIONAL HOLDING** | § | |
| **COMPANY, VARTEC TELECOM OF** | § | |

**VIRGINIA, INC., Debtors, on Behalf of the**
**Bankruptcy Estates of Said Debtors,**          §
                                                 §
              **Plaintiff,**                     §
**v.**                                           §
                                                 §
**RURAL TELEPHONE FINANCE**                      §
**COOPERATIVE,**

              **Defendant.**

### MEMORANDUM OPINION ON MOTION TO DISMISS COUNT TEN

This opinion addresses the question as to whether "deepening insolvency" may be plead as

a separate cause of action or whether it is treated only as a breach of a separate duty under state

tort law or as a theory of damages.  In the instant adversary proceeding, the Rural Telephone

Finance Cooperative ("RTFC") has filed a Motion to Dismiss Count Ten of Complaint and Brief

in Support ("Motion to Dismiss").  The Official Committee of Unsecured Creditors of VarTec

Telecom, Inc., *et al.* (the "Committee") filed a response.  Both the RTFC and the Committee

presented argument at the hearing.  After reviewing the pleadings and hearing the argument of

counsel, the Court took the Motion to Dismiss under advisement for further consideration.  After

consideration, the Court finds that deepening insolvency would not be recognized as a tort under

Texas law; and therefore, the Motion to Dismiss should be granted.

### *Causes of Action*

The Original Complaint filed by the Committee asserts ten causes of action against the

RTFC: (1) fraudulent transfers; (2) preferences; (3) avoidance of the RTFC's prepetition security

interests; (4)  avoidance of the RTFC's replacement liens and super priority protections; (5)

disgorgement (6) disallowance of the claims of the RTFC; (7) equitable marshaling of assets; (8)

equitable subordination of claims; (9) deepening insolvency; and (10) turnover.

### *The Instant Motion*

In the Motion to Dismiss, the RTFC has asked that the Committee's ninth cause of action, entitled "Count Ten–Deepening Insolvency" in the Original Complaint be dismissed for failure to state a claim upon which relief may be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6), as made applicable by Federal Rule of Bankruptcy Procedure 7012(b). For the purpose of this Motion to Dismiss, the Court will adopt the factual allegations in the Original Complaint as true and will draw all factual inferences in favor of the Committee's position and against the RTFC.

### *Jurisdiction*

This memorandum opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rules of Bankruptcy Procedure 7052. The Court has jurisdiction pursuant to 28 U.S.C. §§ 1334 and 151, and the standing order of reference in this district. This proceeding is core, pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (E), (F), (H), (K) & (O).

## I.    FACTS ALLEGED IN THE COMPLAINT[1]

VarTec Telecom, Inc. ("VarTec"), along with its sixteen direct and indirect domestic subsidiaries, each of which is a debtor in this administratively consolidated proceeding, and its eighteen non-debtor direct and indirect foreign subsidiaries provided telecommunications services to North America and Europe.

---

[1] These facts are largely taken from the Original Complaint as alleged by the Committee and do not constitute findings of fact by the Court.

VarTec was founded in 1989 and began its business by marketing a "10-10 dial-around" long distance service to small business and residential customers. VarTec then began to offer traditional local, long distance, and wireless telephone services as well as internet access.

In February 2000, VarTec and the RTFC executed loan agreements which provided for a $334 million term loan and a revolving line of credit of up to $200 million (the "Load Agreements"). In connection with the Loan Agreements, on February 28, 2000, VarTec Telecom Holding Company ("VarTec Holding"), a wholly owned subsidiary of VarTec, executed a Pledge and Security Agreement to secure the obligations to the RTFC under the Loan Agreements by granting a security interest in stock in six of VarTec's subsidiaries.

In 2001, VarTec sought approval from the RTFC to acquire a number of companies commonly referred to as the Excel companies or Excelcom, Inc. ("Excel") which marketed its services through a multi-level marketing concept and offered services similar to those of VarTec. Excel had an international network of over 130,000 independent representatives who participated in the multi-level marketing scheme and received commissions and bonuses based on the usage of Excel products by customers they had recruited the success of the independent representatives efforts in their "downline". The RTFC approved the acquisition, which closed in April 2002, and VarTec Holding executed a Modification to Pledge and Security Agreement dated May 15, 2002, which added the stock, but not the assets of, Excel and several other subsidiaries of VarTec.

According to the Original Complaint, almost immediately after the acquisition of Excel, VarTec began to encounter financial difficulties which prompted the RTFC to question the financial viability of VarTec, and on September 25, 2002, a Second Modification to Pledge and

Security Agreement was executed by VarTec Holding. In this agreement, the stock in VarTec Resource Services, Inc. was added to the security held by the RTFC.

On November 19, 2003, VarTec met with the RTFC to discuss its weakening financial condition, and revealed that as of September 2003, its projected earnings before interest, taxes, depreciation and amortization ("EBITDA") for 2003 was approximately $25 million, well below its earlier projected EBITDA of $180 million for 2003. At that same meeting, VarTec claimed that it had begun to address the significant issues causing its downturn in earnings and presented projections for an increased EBITDA in 2004 of approximately 20 percent over 2003 earnings.

The RTFC apparently did not have much faith in VarTec's projected improvement for 2004, and on November 30, 2003 downgraded VarTec's borrower risk rating from 4.4 to 7.0, a rating that represents a "problem credit" under the RTFC's guidelines that grades risk on a scale of 1.0 to 10.0, with a 10.0 rating considered uncollectible. The RTFC began negotiating an amendment to the Loan Agreements by trying to acquire additional collateral to secure VarTec's indebtedness. This effort culminated in the execution of a third amendment to the Loan Agreements. As a condition of the third amendment to the Loan Agreements, several of VarTec's subsidiaries executed unconditional joint and several guarantees to the RTFC guaranteeing the obligations of VarTec under the Loan Agreements, and VarTec Holding executed its own separate guarantee along the same lines. The guarantors included the Excel companies, whose assets accounted for approximately half of the value of the Debtor's receivables and property, plant and equipment. None of the guarantors had guaranteed the indebtedness to the RTFC under prior agreements.

To further enhance its security position, the RTFC also required that VarTec and certain subsidiary guarantors execute and obtain deposit account control agreements, and that other security, cash controls, and lien perfection arrangements be made in connection with the third amendment to the Loan Agreements to perfect security interests in deposit accounts and funds in which the RTFC did not previously have a perfected security interest.

VarTec's financial condition continued to deteriorate through the first half of 2004. Instead of achieving the optimistic revenue growth portrayed in its projections, VarTec's revenues actually declined rapidly. In May 2004, the RTFC downgraded VarTec's loans to an 8.0 rating, and the National Rural Utilities Cooperative Finance Corporation, RTFC's source of funds, established a loan loss reserve for VarTec of approximately $134 million and placed the loan on non-accrual by May 2004, recognizing that the Loan Agreements were undersecured.

In May 2004, VarTec and the RTFC discussed bankruptcy alternatives. In addition, they began working on yet another amendment to the Loan Agreements. RTFC representatives working with VarTec informed RTFC's board by July 1, 2004, of the high probability of VarTec's bankruptcy and indicated RTFC's intent to work with VarTec on planning for a bankruptcy filing by VarTec. At around the same time, both the RTFC and VarTec engaged bankruptcy counsel to assist in bankruptcy planning efforts.

Leading up to VarTec's bankruptcy filing on October 7, 2004, the RTFC arranged for VarTec to pay down the Loan Agreement by $90 million through a loan to Telephone Electronics Corporation, the proceeds of which were transferred to VarTec. Conditioned on the $90 million pay down of VarTec's indebtedness, the RTFC entered into an First Amended Restated Credit Agreement ("FARCA"), on October 7, 2004. Under the FARCA, the RTFC agreed to combine

VarTec's term loan agreement and revolving line of credit agreement. Prior to this transaction, the RTFC's loans to VarTec were not secured by the assets or stock of Telephone Electronics Corporation.

In addition, to receiving the $90 million pay down on its loans within three weeks of bankruptcy, the Original Complaint alleges that in the FARCA VarTec agreed to allow the RTFC to offset an additional $32.5 million on its term loan obligation through the liquidation of certain assets. In connection with the October 7th FARCA, the obligations of the subsidiary guarantors were also amended and restated to secure payment and performance of all the obligations under the FARCA.

In sum, the FARCA  added additional collateral that the RTFC did not have under the prior loan agreements, positioning the RTFC for VarTec's impending bankruptcy filing.  VarTec then filed its petition for relief under chapter 11 of the Bankruptcy Code on November 1, 2004.

**II. ISSUE**

Is deepening insolvency, as plead in Count Ten of the Original Complaint a separate, actionable tort under Texas law, or should it be stricken for failure to state a claim upon which relief may be granted?

### III.     ANALYSIS

#### A.     Legal Standard for Motions to Dismiss

The Motion to Dismiss challenges the sufficiency of a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure made applicable to this proceeding by Rule 7012 of the Federal Rules of Bankruptcy Procedure.  A motion to dismiss under Rule 12(b)(6) is for the complaint's failure to state a claim upon which relief can be granted.  A complaint may not be dismissed for failure to state a claim upon which relief may be granted unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his or her claim that would entitle the plaintiff to relief.  *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 102 L.Ed.2d 80 (1957); *Benton v. United States*, 960 F.2d 19, 20 (5th Cir. 1992).

In applying this test, the Court must consider the facts and reasonable inferences drawn from the pleadings in the light most favorable to the non-movant.  *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Fernandez-Montes v. Allied Pilots Association*, 987 F.2d 591, 284 (5th Cir. 1993).  A motion to dismiss under Rule 12(b)(6) "is viewed with disfavor and is rarely granted." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000) (quoting *Kaiser Aluminum & Chem. Sales v. Avondale Shipyards*, 677 F.2d 1045, 1050 (5th Cir. 1982).

Although the Court, in making its determination must take all facts pleaded in the complaint as true and must liberally construe the complaint in favor of the plaintiff, the plaintiff has an obligation to plead specific facts, not mere conclusory allegations. *Collins*, 224 F.3d at 498(citing *Campbell v. Wells Fargo Bank*, 781 F.2d 440, 442 (5th Cir. 1986)).  To the extent that

the plaintiff's claims set forth conclusory allegations or unwarranted deductions of fact, this Court

is not obliged to accept such allegations or deductions as true.  *Id.* (citation omitted).

In the present case, the RTFC asserts that Count Ten of the Original Complaint should be

dismissed for failure to state a claim upon which relief may be granted because the claim of

"deepening insolvency" as asserted by the Committee is both legally and factually insufficient and

"deepening insolvency" is not recognized as a tort in Texas.  Further, the RTFC asserts that the

Original Complaint, as it relates to Count Ten, merely contains vague conclusory accusations of

wrongdoing by the RTFC.

### B.      Deepening Insolvency–What is it, How Did it Get Here, and What Do We Do with it Now That We've Let it into the House?

#### *What is Deepening Insolvency?*

The Bankruptcy Court for the Southern District of New York recently defined the theory

of deepening insolvency as: "the 'fraudulent prolongation of a corporation's life beyond

insolvency,' resulting in damage to the corporation caused by increased debt."  *Kittay v. Atlantic*

*Bank of New York (In re Global Service Group, LLC),* 316 B.R. 451, 456 (Bankr. S.D.N.Y.

2004) (Bernstein, C.J.) (quoting *Schacht v. Brown,* 711 F.2d 1343, 1350 (7th Cir. 1983)).  Judge

Bernstein traced its origin as a theory of recovery to *Bloor v. Dansker (In re Investors Funding*

*Corp. of New York Sec. Litig.)*, 523 F.Supp. 533 (S.D.N.Y. 1980).  Judge Bernstein explains:

> [T]he complaint alleged that the debtor's insiders (the Danskers) embarked on a scheme to loot the corporate debtor.  *In re Investors Funding Corp.,* 523 F.Supp. at 536.  Relying on a false picture of the debtor's financial well-being, they induced creditors and shareholders to invest more funds in the company.  Thereafter, they misappropriated a portion of the funds that were raised.  *See id.* at 536.
>
> Peat, Marwick, Mitchell & Co. ("PMM") had served as the debtor's outside auditor. The debtor's chapter X trustee sued PMM, charging that the Danskers used the false financial statements that PMM had certified to further their scheme.  *Id.* at 537.

PMM moved for partial judgment on the pleadings or for partial summary judgment, and argued, *inter alia,* that the knowledge and wrongful conduct of the insiders should be imputed to the debtor's insiders to defeat recovery. *Id.* at 533.

PMM's argument invoked the "adverse interest" exception to the general rule that the agent's knowledge will be imputed to his principal. According to the District Court, the "adverse interest" exception applied if the agent acted adversely to the interest of his principal, but did not apply "where the agent is also acting for the principal's benefit, even though the agent's primary interest is inimical to that of the principal." *Id.* at 541. PMM urged that although the Dansker's were motivated by personal interests, the complaint also alleged that the debtor benefitted from the infusion of funds.

In words that begat the theory of "deepening insolvency," the District Court rejected the notion that acts that prolong a corporation's existence automatically confer a benefit on the corporation:

> [E]ven to the extent one focuses upon the artificial financial picture of IFC [the debtor] created by the Danskers which prolonged IFC's existence several years beyond its actual insolvency, PMM's position is not persuasive. *A corporation is not a biological entity for which it can be presumed that any act which extends its existence is beneficial to it.* The complaint plainly alleges that, as a result of the Danskers' practices, IFC's financial situation was caused to deteriorate even further after 1971. Accepting the allegations of the complaint as true, it is manifest that the prolonged artificial solvency of IFC benefitted only the Danskers and their confederates, not IFC.

*Id.* (emphasis added).

*Global Service Group*, 316 B.R. at 457. In *Schacht v. Brown*, when asked by the defendants to adopt the position that a corporation may never sue to recover damages alleged to have resulted from the artificial prolongation of an insolvent corporation's life, the Seventh Circuit refused, tacitly following the often used maxim of "never say never" and stating:

> First, in the underlying allegations here, the Director charges that the damage to Reserve stemmed not only from the mere extension of the normal business operation of Reserve, but from specific actions crippling Reserve which were taken as an integral part of that extension. *Inter alia,* the Director alleges that with the smoke-screen of the underlying mail fraud, Reserve's directors and other defendants were able to drain Reserve of over $3,000,000 of income, and to drain Reserve of its

most profitable and least risky business, thereby deepening Reserve's insolvency. Thus, the "asset dissipation" alleged was not only that which resulted from the normal operation of the business, as in the cases cited by the defendants, but also that which resulted from the bleeding of Reserve which was a part of the underlying scheme to defraud.

Alternatively, to the extent that the cited cases suggest that a corporation may not sue to recover damages resulting from the fraudulent prolongation of its life past insolvency, we decline to speculate that the Illinois courts would accept this restriction on the Director's freedom of action. For each of these cases rests upon a seriously flawed assumption, *i.e.,* that the fraudulent prolongation of a corporation's life beyond insolvency is automatically to be considered a benefit to the corporation's interests. This premise collides with common sense, for the corporate body is ineluctably damaged by the deepening of its insolvency, through increased exposure to creditor liability. *See In Re Investor's Funding Corp.,* [1980] Fed.Sec.L.Rep. (CCH) ¶ 97,696, at 98,655 (S.D.N.Y.1980). Indeed, in most cases, it would be crucial that the insolvency of the corporation be disclosed, so that shareholders may exercise their right to dissolve the corporation in order to cut their losses. Thus, acceptance of a rule which would bar a corporation from recovering damages due to the hiding of information concerning its insolvency would create perverse incentives for wrong-doing officers and directors to conceal the true financial condition of the corporation from the corporate body as long as possible. We are not prepared to conclude that the Illinois courts would adopt such a regime.

*Schacht v. Brown,* 711 F.2d 1343, 1350 (7th Cir. 1983) (citations omitted).

The phrase "deepening insolvency" seems to have evolved from this dictum from the Seventh Circuit: "[T]he corporate body is ineluctably damaged by the deepening of its insolvency." *See* Sabin Willett, *The Shallows of Deepening Insolvency*, 60 BUS. LAW. 549, 550 (Feb., 2005). In *Schacht v. Brown*, the Seventh Circuit had before it an appeal of a district court's denial of a motion to dismiss a complaint containing allegations that the corporation's directors had breached their fiduciary duties to the corporation. One of the theories of damages suffered by the corporation put forth by the plaintiff in the complaint was that the corporation was harmed by the prolongation of its life by its corporate fiduciaries in their effort to siphon off corporate assets in the interim.

Thus, "deepening insolvency was first recognized as a theory for recovery in actions for breach of fiduciary duty alleging that officers or directors deepened the insolvency of the corporation and reduced or eliminated any return for creditors." *Limor v. Buerger (In re Del-Met Corp.)*, 322 B.R. 781, 811-812 (Bankr. M.D. Tenn. 2005). This makes some sense; however, as Judge Lundin also states in *Del-Met*, over a relatively short period of time "[t]he action has morphed, both in form–from a breach of statutory duty claim to a form of common law tort liability–and in scope–now reaching lawyers, accountants, bankers and other financial and insolvency professionals." *Id*. at 812; *accord Alberts v. Tuft (In re Greater Southeast Community Hospital Corp.)*, __ B.R. __, 2005 WL 3036507, at *3 (Bankr. D. Dist. Col. 2005) ("Originally a theory of damages, the concept has taken on a life of its own, with several courts treating it as an independent cause of action."); *Global Service Group*, 316 B.R. at 457 ("What began as a justification for recognizing the 'adverse interest' exception soon morphed into a theory of recovery."). This is where things start to get a little murky.

### If Deepening Insolvency Exists as a Separate Tort, it is a Creature of State Law

The words "deepening insolvency" are neither contained in the Bankruptcy Code, nor do they arise from other federal law, so the courts that consider the theory of "deepening insolvency" to be an actionable tort do so by predicting how their respective state courts would rule when adopting a new cause of action. *See Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.,* 267 F.3d 340, 349-52 (3d Cir. 2001)(construing Pennsylvania law); *Official Comm. of Unsecured Creditors v. Credit Suisse First Boston (In re Exide Technologies, Inc.),* 299 B.R. 732, 750-52 (Bankr. D. Del. 2003)(construing Delaware law); *see also Del-Met*, 322 B.R. at 815 (construing Tennessee law). In the present case, this Court must look to Texas law.

In its response to the Motion to Dismiss, the Committee asserts that, given the chance, the Texas Supreme Court would recognize deepening insolvency as a separate and an independent claim following the factors described by the Third Circuit in the *Lafferty* decision–(1) the soundness of the theory; (2) its growing acceptance among the courts and (3) the remedial theme under Pennsylvania law. *See Lafferty*, 267 F.3d at 349-352. The Third Circuit made this prediction because it could find no reported decisions from the Pennsylvania courts, stating:

> Neither the Pennsylvania Supreme Court nor any intermediate Pennsylvania court has directly addressed this issue. In the absence of an opinion from the state's highest tribunal, we must don the soothsayer's garb and predict how that court would rule if it were presented with the question. Indeed, because no state or federal courts have interpreted Pennsylvania law on this subject, we will rely predominantly on decisions interpreting the law of other jurisdictions and on the policy underlying Pennsylvania tort law to make this prediction.

*Lafferty*, 267 F.3d at 349 (citations omitted). The panel traced the theory's history to the Seventh Circuit's decision in *Schacht v. Brown*, and found that the "[g]rowing acceptance of the deepening insolvency theory [by other federal courts] confirms its soundness." *Id*. at 350 (citing cases). The only Pennsylvania authority cited for the proposition that the Supreme Court of Pennsylvania would adopt the theory as a cognizable claim was that "one of the most venerable principles in Pennsylvania jurisprudence, and in most common law jurisdictions for that matter, is that, where there is an injury, the law provides a remedy. *See 37 Pennsylvania Law Encyclopedia,* Torts § 4, at 120 (1961) ('For every legal wrong there must be a correlative legal right.') (citation omitted). . . . Thus, where "deepening insolvency" causes damage to corporate property, we believe that the Pennsylvania Supreme Court would provide a remedy by recognizing a cause of action for that injury." *Id*. at 351.

The Bankruptcy Court for the District of Delaware made much the same analysis in *Exide*

*Technologies*, relying principally on the *Lafferty* decision:

> I must first determine whether a deepening insolvency claim is cognizable under
> Delaware law. The Supreme Court of Delaware has not spoken on the tort of
> deepening insolvency. For this reason, I must predict how the Delaware Supreme
> Court would rule on the claim if such claim was presented to it. To do this, the Court
> must examine:
>
> > (1) what the Delaware Supreme Court has said in related areas;
> > (2) the "decisional law" of the Delaware intermediate courts;
> > (3) federal appeals and district court cases interpreting the state law;
> > (4) decisions from other jurisdictions that have discussed the issue we face
> > here.
>
> The first two inquiries do not yield authority that is helpful, so I must look to federal
> cases that have interpreted deepening insolvency claims.
>
> ***
>
> The Court of Appeals [in *Lafferty*] held that three factors "would persuade the
> Pennsylvania Supreme Court to recognize 'deepening insolvency'" as giving rise to
> a cognizable injury in the proper circumstances. *Lafferty,* 267 F.3d at 352. These
> factors were the: (1) soundness of the theory; (2) growing acceptance of the theory
> among courts; and (3) remedial theme in Pennsylvania law (when there is an injury).
> *Id.* The Court found that the theory of deepening insolvency, particularly in the
> bankruptcy context, was a sound one. *Id.* at 349-50. Furthermore, the Court found
> that the "[g]rowing acceptance of the deepening insolvency theory confirms its
> soundness." *Id.* at 350. The Court then cited numerous cases in which deepening
> insolvency was found to give rise to a cognizable injury. *Lafferty,* 267 F.3d at
> 350-51. Finally, the Court determined that "one of the most venerable principles in
> Pennsylvania jurisprudence, and in most common law jurisdictions for that matter is
> that, where there is an injury, the law provides a remedy." *Id.* at 351, *citing 37*
> *Pennsylvania Law Encyclopedia, Torts* § 4, at 120 (1961).

*Official Comm. of Unsecured Creditors v. Credit Suisse First Boston (In re Exide Technologies,*

*Inc.),* 299 B.R. 732, 751-52 (Bankr. D. Del. 2003). Relying on the *Lafferty* decision as support

that the initial factors that the court had to consider were met, and the Delaware state courts'

policy of providing a remedy for an injury, the court concluded that the "Delaware Supreme

Court would recognize a claim for deepening insolvency when there has been damage to corporate property." *Id*.

The most recent case to adopt the *Lafferty* rationale comes from the Bankruptcy Court for the Northern District of Ohio that felt obliged to follow this line of cases because the debtors were New Jersey and Delaware corporations. *See In re LTV Steel Company, Inc.*, __ B.R. __, 2005 WL 2573515, *21 (Bankr. N.D. Ohio 2005).  In granting derivative standing to a committee of administrative creditors to assert a cause of action against the officers and directors of the debtor the bankruptcy court said, "LTV Steel is a New Jersey corporation.  LTV Corporation is a Delaware Corporation.  New Jersey and Delaware are each in the Third Circuit.  Therefore, the *Lafferty* and *Exide Technologies* cases, decided by courts in the Third Circuit, and in which both the Third Circuit and the Delaware bankruptcy courts indicated their approval of deepening insolvency as a free-standing tort, arguably apply to the proposed lawsuit." *Id*.

After a very thorough analysis of the law in this area, Judge Lundin, in *Del-Met*, relied on much the same reasoning as the court in *Exide Technologies* when faced with trying to predict what the Supreme Court of Tennessee would conclude about the theory of deepening insolvency:

> No Tennessee decision has been found addressing deepening insolvency.  This court must determine, as did the Third Circuit in *Lafferty* (looking to Pennsylvania law), whether the Tennessee Supreme Court would recognize deepening insolvency as an actionable breach of duty.
>
> ***
>
> The analysis in *Lafferty* is sound.  As to the third factor, the Tennessee Supreme Court has adopted the same jurisprudential principle as the Pennsylvania high court:  where there is a tortious injury, the law will provide a remedy.  *See, e.g., McFarlane v. Moore,* 1 Tenn. 174 (1805) ("By the principles of the common law, there can be no injury without a correspondent remedy.").  This court concludes that if presented with compelling facts, the Tennessee Supreme Court would recognize deepening insolvency as an actionable breach of duty to a corporation.

*Limor v. Buerger (In re Del-Met Corp.)*, 322 B.R. 781, 813-815 (Bankr. M.D. Tenn. 2005).

However, as shown above, Judge Lundin concluded that "deepening insolvency" was not a tort,

but an actionable breach of a separate duty owed to a corporation. *Id*. The duty in *Del-Met*

arguably arose because the complaint alleged that certain creditors took over the management and

control of the debtors which lead to duties that were either fiduciary or special in nature. *Id*. at

808-813. The torts alleged in the complaint were breaches of fiduciary duties and aiding and

abetting breaches of fiduciary duties. *Id*.

After a separate very thorough analysis of the law in this area, Judge Bernstein, in *Global*

*Service Group*, rejected the theory of deepening insolvency as a separate claim outright under

New York Law, relegating it to simply a theory of damages that may result from the commission

of a separate tort. *See Kittay v. Atlantic Bank of New York (In re Global Service Group, LLC),*

316 B.R. 451, 457- 459 (Bankr. S.D.N.Y. 2004). Looking at the evolution of the law in this

area, Judge Bernstein pointed out that the majority of federal courts to consider the viability of

the deepening insolvency theory have either treated it as a theory of damages or have raised

serious questions about its viability. *Id* (citing *Schacht,* 711 F.2d at 1350 (treating deepening

insolvency as a theory of damages; *Hannover Corp. of America v. Beckner,* 211 B.R. 849, 854

(M.D. La. 1997) (same); *Allard v. Arthur Andersen & Co. (USA),* 924 F.Supp. 488, 494

(S.D.N.Y. 1996) (same); *Drabkin v. L & L Constr. Assocs., Inc. (In re Latin Inv. Corp.),* 168

B.R. 1, 6 (Bankr. D.C. 1993) (same); *Florida Dep't of Ins. v. Chase Bank of Texas Nat'l Ass'n,*

274 F.3d 924, 935-36 (5th Cir. 2001)(questioning whether Texas would recognize the cause of

action); *Askanase v. Fatjo,* No. Civ. A. H-91-3140, 1996 WL 33373364, at *28 (S.D. Tex.

Apr.1, 1996) (rejecting trustee's "deepening insolvency" argument because the insolvent debtor

was not damaged by false financial statements since the shareholders had already lost all of their

equity and the complaint did not allege that any creditor was injured); *Feltman v. Prudential*

*Bache Sec.,* 122 B.R. 466, 473- 74 (S.D. Fla. 1990)(rejecting argument that insolvent corporation

was harmed by artificial extension of its life where complaint alleged that corporation was a sham,

without a corporate identity and served as a conduit for stolen money)).

Similar to *Global Services Group*, other recent decisions have also rejected deepening

insolvency as a separate cause of action. *See Alberts v. Tuft (In re Greater Southeast Community*

*Hospital Corp.)*, __ B.R. __, 2005 WL 3036507, *4 (Bankr. D. Dist. Col. 2005)("; *Bondi v.*

*Bank of America Corp. (In re Parmalat)*, 383 F.Supp.2d 587 (S.D.N.Y. 2005).


### *Would the Supreme Court of Texas Recognize the Tort of Deepening Insolvency?*

The question left for this Court to answer is whether "deepening insolvency" is recognized

as a separate cause of action in Texas. In the *Florida Dep't of Ins. v. Chase Bank* decision, the

Fifth Circuit pointed out that the courts in Texas have not recognized the theory of "deepening

insolvency" and questioned its viability. *See Florida Dep't of Ins. v. Chase Bank of Texas Nat'l*

*Ass'n,* 274 F.3d 924, 935-36 (5th Cir. 2001). Neither the Committee nor the RTFC has directed

the Court to a Texas case expressly adopting or rejecting the theory, and the Court has found

none.

In the absence of guidance from the Supreme Court of Texas, the Fifth Circuit has

instructed that in predicting state law, a court should look in order to:

> (1) decisions of the Texas Supreme Court in analogous cases;
> (2) the rationales and analyses underlying Texas Supreme Court decisions on
> related issues;
> (3) dicta by the Texas Supreme Court;
> (4) lower state court decisions;

(5) the general rule on the question;
(6) the rulings of courts of other states to which Texas courts look when formulating substantive law; and
(7) other available sources, such as treatises and legal commentaries.

*Centennial Ins. Co. v. Ryder Truck Rental, Inc.*, 149 F.3d 378, 382 (5th Cir. 1998). The Supreme Court of Texas has not spoken on the issue of whether "deepening insolvency" is its own cause of action or even whether it is a measure of damages. Thus this Court must look to the rationales and analyses underlying Texas Supreme Court decisions on the issue of recognizing a tort not previously recognized in Texas jurisprudence.

As the Committee's response to the Motion to Dismiss points out, Texas courts also adhere to the principle that a remedy is provided for every legal wrong. *See Payant v. Corpus Christi Plaza Hotel Co.*, 149 S.W.2d 665-667 (Tex.Civ.App–El Paso 1941, *writ dism'd*). However, the Texas Supreme Court is not keen on recognizing new torts, and "treads cautiously" in this area. *See Trevino v. Ortega*, 969 S.W.2d 950, 951 (Tex. 1998). The Texas Supreme Court in *Trevino* stated:

> This Court treads cautiously when deciding whether to recognize a new tort. *See generally Kramer v. Lewisville Mem'l Hosp.,* 858 S.W.2d 397, 404-06 (Tex.1993); *Graff v. Beard,* 858 S.W.2d 918, 920 (Tex.1993); *Boyles v. Kerr,* 855 S.W.2d 593, 600 (Tex.1993). While the law must adjust to meet society's changing needs, we must balance that adjustment against boundless claims in an already crowded judicial system. We are especially averse to creating a tort that would only lead to duplicative litigation, encouraging inefficient relitigation of issues better handled within the context of the core cause of action.

*Id*. at 952; *see also Cain v. Hearst Corp.*, 878 S.W.2d 577, 579 (Tex. 1994) (rejecting the adoption of the tort of "false light" in Texas because it largely duplicated existing claims and lacked the procedural limitations that accompanied the other causes of action).

In *Cain*, the Texas Supreme Court acknowledged that the tort of "false light" had been recognized by several Texas Courts of Appeal and federal courts interpreting Texas law, and that it had also been included in the *Restatement (Second) of Torts*; however, the court rejected its adoption in Texas saying, "The false light cases considered by Texas courts of appeals, were all brought, or could have been brought, under another legal theory. . . . We see no reason to recognize a cause of action for false light invasion of privacy when recovery for that tort is substantially duplicated by torts already established in this State." *Id* at 581.

Whether "deepening insolvency" is either a theory of damages and not a tort at all, or whether the damages recoverable are substantially duplicated by other torts was largely addressed by the analysis in *Global Services Group*:

> Decisions since *Investors Funding* suggest that the New York courts regard "deepening insolvency" as a theory of damages that may result from the commission of a separate tort. *See, e.g., Allard,* 924 F.Supp. at 494 (relying on "deepening insolvency" to reject the contention that a bankruptcy trustee could not recover damages in an action based on RICO, federal securities law violations and related state and common law claims); *Gouiran Holdings, Inc. v. DeSantis, Prinzi, Springer, Keifer & Shall (In re Gouiran Holdings, Inc.),* 165 B.R. 104, 107 (E.D.N.Y.1994)(reversing grant of motion to dismiss claim for negligent preparation of financial statements which may have resulted in debtor's "incurring unmanageable debt and filing for bankruptcy"); *Corcoran v. Frank B. Hall & Co.,* 149 A.D.2d 165, 545 N.Y.S.2d 278, 283-85 (N.Y.App.Div.1989)(liquidator of insurance company stated claims for common law fraud and insurance law violations arising from the concealment of insurance company's financial condition which caused insurance company to assume additional risks and increase its final financial exposure). No reported New York case, however, has ruled that "deepening insolvency" is an independent tort.
>
> The distinction between "deepening insolvency" as a tort or damage theory may be one unnecessary to make. Prolonging an insolvent corporation's life, without more, will not result in liability under either approach. Instead, one seeking to recover for "deepening insolvency" must show that the defendant prolonged the company's life in breach of a separate duty, or committed an actionable tort that contributed to the continued operation of a corporation and its increased debt. *E.g., R.F. Lafferty & Co.,* 267 F.3d at 345, 349 (defendants used fraudulent financial statements to raise

capital in the debtor's name, thereby deepening debtor's insolvency and causing bankruptcy); *Schacht,* 711 F.2d at 1350 (parent company and directors continued to operate insolvent company by fraudulently concealing the company's insolvency); *Allard,* 924 F.Supp. at 494 (fraud by debtor's accountant led to continued operations and increased debt); *In re Gouiran Holdings, Inc.,* 165 B.R. at 107 (negligent preparation of financial statements may have caused debtor to incur unmanageable debt and file for bankruptcy); *In re Exide Techs., Inc.,* 299 B.R. at 750-52 (recognizing "deepening insolvency" cause of action against lender who had obtained control of the debtor and used its control to prolong the debtor's life for two years and to force it to enter into transactions or delay a bankruptcy filing in order to favor the lender at the expense of the debtor); *Tabas v. Greenleaf Ventures, Inc. (In re Flagship Healthcare, Inc.),* 269 B.R. 721, 728-29 (Bankr. S.D. Fla. 2001) (negligently prepared valuation report induced corporation to continue to make corporate acquisitions and borrow additional funds, and resulted in financial deterioration); *In re Latin Inv. Corp.,* 168 B.R. at 6 (concluding that the trustee had standing to sue for injuries to the debtor based on the allegations that the defendants perpetuated the business past the point of insolvency in order to loot it).

*Global Service Group*, 316 B.R. at 458. The *Lafferty* decision largely relied on for the decisions by the courts in *Exide Technologies* and *Del-Met* finding the legal theory to be sound, involved a "Ponzi scheme" in which the defendants caused the company to issue fraudulent debt certificates which were then sold to individual investors, and involved a suit for the fraudulent inducement to invest. *See Lafferty*, 267 F.3d at 343. *Lafferty* was ultimately a fraud case where deepening the insolvency of the corporation could have been considered as part of the breach of the officers' and directors' fiduciary duties owed to the corporation with resulting damages. The statement made by Judge Bernstein in *Global Services Group* that "one seeking to recover for 'deepening insolvency' must show that the defendant prolonged the company's life in breach of a separate duty, or committed an actionable tort that contributed to the continued operation of a corporation and its increased debt" bears itself out when looking closely at the facts of the cases that have considered this issue. *See Global Service Group*, 316 B.R. at 458 (discussing cases); *Del-Met*, 322 B.R. at 813-815 (finding in ruling on a motion to dismiss that certain creditors who had taken

over control of a corporation owed a duty that could have been breached by the corporation's "deepening insolvency").  This also seems to be the trend of the more recent cases to look at this issue.  *See Alberts v. Tuft (In re Greater Southeast Community Hospital Corp.)*, __ B.R. __, 2005 WL 3036507, at *3 (Bankr. D. Dist. Col. 2005) ("the *sine qua non* of the concept is that the defendant breached some pre-existing duty of care owed to the corporation in deepening its insolvency"); *Bondi v. Bank of America Corp. (In re Parmalat)*, 383 F.Supp.2d 587, 602 (S.D.N.Y. 2005) (finding that a separate tort of "deepening insolvency" would not be recognized under North Carolina law).

With this in mind, the Court finds that the Texas Supreme Court would not adopt "deepening insolvency" as a separate tort, because the injury caused by the deepening of a corporation's insolvency is substantially duplicated by torts already established in Texas.[2] Further, as the case law in this area has shown, for a plaintiff to assert a valid claim for damages under a theory of "deepening insolvency" the plaintiff must show that the defendant has committed some other tort.  "Put more bluntly, if you honestly treat deepening insolvency as a tort, it collapses into already existing torts, be it a breach of fiduciary duty (*Del-Met*), accounting malpractice (*Parmalat*), or some other cause of action."  Erik Weiting Hsu and Michael A. McConnell, *Post Confirmation Litigation: The Creditor's Last Chance?  Part III: A Critical*

---

[2] In doing so, this Court also acknowledges its role as a bankruptcy court in the process of establishing new law in the State of Texas, and that this role should be minimal at best in a case such as this where neither the Texas Supreme Court nor the lower courts in Texas have spoken on the issue.  Much like the court said in *Parlamant* when asked to interpret the law of North Caroliana, "The Court declines the invitation to recognize a novel tort duty giving rise to a novel cause of action under North Carolina law."  *Bondi v. Bank of America Corp. (In re Parmalat)*, 383 F.Supp.2d 587, 602 (S.D.N.Y. 2005).

*Look at Two Popular Causes of Action*, p. 4, presented at the University of Texas School of Law 24th Annual Bankruptcy Conference, November 10-11, 2005.

### *Where's the Tort?*

Much like the little old lady in the fast food commercials, the Court looks at the bottom of the deepening insolvency hamburger bun and is forced to ask "where's the tort?"  If  Texas courts were to apply the theory of deepening insolvency as a tort separate and apart from torts already existing under Texas law, does a cause of action for "deepening insolvency" fit the definition of a tort?  As  Judge Bernstein in *Global services Group* indicates, and as commentators have recently addressed, asking this question usually results in leaving what is before a court to be simply a measure of damages or a breach of tort that has already been established.  *See Id.*; *see also Alberts v. Tuft (In re Greater Southeast Community Hospital Corp.)*, __ B.R. __, 2005 WL 3036507, at *4 (Bankr. D. Dist. Col. 2005) ("This court has recognized that the deepening of a company's insolvency is harmful. . . . However, recognizing that a condition is harmful and calling it a tort are two different things."); William Bates III, *Deepening Insolvency: Into the Void*, 24 AM, BANKR. INST. J. 1 (March 2005); Jay R. Bender, *Deepening Insolvency In Alabama: Is it a Tort, a Damage Theory or Neither of the Above?* 66 ALA. LAW. 190 (May 2005); Sabin Willett, *The Shallows of Deepening Insolvency*, 60 BUS. LAW. 549, 550 (Feb., 2005).

If "deepening insolvency" were a tort, what would its elements be?  The elements of a tort in Texas are (1) duty; (2) breach of that duty; ( 3) proximate causation and (4) injury.  *See Conway v. Chambers*, 823 S.W.2d 331, 334 n.1 (Tex.App.–Texarkana 1991) *aff'd*, 883 S.W.2d 156 (Tex. 1993) (citing Prosser, HANDBOOK OF THE LAW OF TORTS).

The theory of "deepening insolvency" cannot pass the first hurdle–duty. An essential element of a cause of action sounding in tort in Texas is the requirement that the defendant owe a duty to the plaintiff. *See El Chico Corp. v. Poole,* 732 S.W.2d 306, 311 (Tex. 1987) ("Duty is the threshold inquiry; a plaintiff must prove the existence and violation of a duty owed to him by the defendant to establish liability in tort."). In cases in this area that have found officers and directors liable for deepening the insolvency of a corporation, defendants had fiduciary duties to the corporation that were imposed by law and were breached, in ways such as siphoning off money from the company or bilking investors, all the while lying about the company's balance sheet. *See Schacht* and *Lafferty*, *supra*. In cases closer to the facts of the present one, lenders have been found liable, not generally, but in situations where they had taken control of the corporation. *See Del-Met*, 322 B.R. at 813-815; *Exide Technologies., Inc.,* 299 B.R. at 750-52.

In Texas, the relationship between a borrower and a lender is not usually fiduciary, or special in nature, so as to impose any extra-contractual duties on the lender. *See Thigpin v. Locke*, 363 S.W.2d 247, 253 (Tex. 1962); *Bank One, Texas, N.A. v. Stewart,* 967 S.W.2d 419, 442 (Tex.App.-Houston [14th Dist.] 1998, *pet. denied*); *see also Fleming v. Tex. Coastal Bank of Pasadena,* 67 S.W.3d 459, 461 (Tex.App.-Houston [14th Dist.] 2002, *pet. denied*); *Manufacturers Hanover Trust Co. v. Kingston Investors Corp.*, 819 S.W.2d 607, 610 (Tex.App.–Houston [1st Dist.] 1991, *no writ.*). Where Texas courts have found such a duty, the findings have rested on extraneous facts and conduct, such as a lender's control of the borrower's business activities. *See Farah v. Mafrige & Kormanik, P.C.,* 927 S.W.2d 663, 675 (Tex.App.–Houston [1st Dist.] 1991, *no writ.*); *see also Bank One, Texas, N.A. v. Stewart,* 967 S.W.2d 419, 442 (Tex.App.-Houston [14th Dist.] 1998, *pet. denied*).

To recover damages for the deepening insolvency of a corporation by the RTFC in the present case, the Committee would have to show that the RTFC did more that just allow VarTec to go deeper into the zone of insolvency, to become more insolvent, or to exist past the point of insolvency. Rather, the Committee would have to show that the RTFC controlled the business activities of VarTec, or in the context of the present Motion to Dismiss, put forward specific well-pled facts that show the RTFC was controlling VarTec's business activities, giving rise to a duty under Texas law. The facts as pled by the Committee in the Original Complaint, even considered in a light mos favorable to the Committee do not contain specific facts that show that the RTFC controlled the actions or took over the management of VarTec. Count Ten of the Original Complaint must therefore be dismissed.

With this decision, the Court falls in line with the *Global Services Group* case*:*

The Complaint alleges, in substance, that Atlantic Bank should be liable for Global's "deepening insolvency" because the bank made a loan that it knew or should have known Global could never repay. This may be bad banking, but it isn't a tort. A third party is not prohibited from extending credit to an insolvent entity; if it was, most companies in financial distress would be forced to liquidate. And while the Complaint alleges that Atlantic Bank made the loan on the strength of its relationship with the Goldmans and their personal assets, this is neither surprising nor improper. Banks prefer to lend to those they know, and have the right to insist on guaranties and pledges of personal assets from the corporate principals. Notably, the Complaint does *not* allege or imply that Atlantic Bank extended the loans to enable the Goldmans to siphon off the funds or commit some other wrong.

*Global Service Group*, 316 B.R. at 458. To some extent, this is also the inferred holding in *Del-*

*Met*:

Whether characterized as a separate tort or as an example of a breach of fiduciary duty, the Trustee's deepening insolvency claim is cognizable only if the Defendants owed duties to the debtor corporations under nonbankruptcy law by virtue of their domination and control such that the run up of debt, the performance of unprofitable contracts, the selective payment of vendors and other allegations in the complaint are actionable breaches.

*Del-Met*, 322 B.R. at 808; *Cf. Bondi v. Bank of America Corp. (In re Parmalat)*, 383 F.Supp.2d 587, 602 (S.D.N.Y. 2005) ("On the facts alleged here, if Bondi's proposed duty existed, any breach of it by the Bank would be as well a breach of the duty not to assist Parmalat's insiders in breaching their fiduciary duties to the Company." Declining the invitation to recognize a novel tort duty giving rise to a novel cause of action under North Carolina law.).

## IV. CONCLUSION

The wilful and malicious lending of money is not a tort in Texas and likely will not be recognized as one anytime soon through a theory of deepening insolvency. To maintain a cause of action against a lender under such a theory, the complaint must show that the lender took over control of the operations of the debtor and then breached its fiduciary duties. The facts as pled by the Committee in the Original Complaint, even considered in a light most favorable to the Committee do not contain specific facts that show that the RTFC controlled the actions or took over the management of VarTec. Therefore, Count Ten shall be dismissed.

A Separate order will be entered consistent with this decision.

###End of Memorandum Opinion###